# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-1893NI, 01-1957NI

_____

| | | |
|---|---|---|
| Housing 21, L.L.C., | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | |
| v. | * | On Appeal from the United |
| | * | States District Court |
| | * | for the Northern District |
| Atlantic Home Builders Company, | * | of Iowa. |
| also known as Champion Home | * | |
| Builders Company, | * | |
| | * | |
| Appellant/Cross-Appellee, | * | |

_____

Submitted: February 13, 2002

Filed: May 16, 2002

_____

Before WOLLMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Defendant Atlantic Home Builders Co., a factory builder of manufactured and modular houses, appeals a jury verdict awarding $435,411.79 in damages to Plaintiff Housing 21, LLC, a real estate developer, for breach of warranty. Housing 21 purchased six modular houses from Atlantic as part of the initial phase of its plan to develop a residential subdivision of 120 such houses in Sioux City, Iowa. The project failed, and Housing 21 sued Atlantic, contending that the six houses that Atlantic

provided were not well constructed and that Atlantic's failure to provide well-constructed houses caused the failure of the entire project. A jury returned a verdict in favor of Housing 21, granting damages for the cost of repair of the six houses, $5,411.79, and for Housing 21's lost investment, $430,000, but not for Housing 21's lost future profits or other incidental damages.

In this appeal, Atlantic argues, first, that the District Court erred in responding to a question from the jury asking for a list of investors in Housing 21. It contends that the identity of Housing 21's investors was irrelevant and that providing such information to the jury was unfairly prejudicial. Second, it argues that Housing 21 failed to establish that defects in the six houses caused, in fact, the failure of the entire project, and, as a result, that the Court erred by not granting judgment as a matter of law in its favor regarding damages for lost investment. Third, it argues that the Court erred by giving jury instructions on damages for both lost investment and lost future profits. In a cross appeal, Housing 21 contends that the Court erred by not awarding it, as a matter of law, damages for lost future profits and that the Court erred in allowing Atlantic to make an improper summation, which, it argues, resulted in the jury's not awarding damages for lost future profits.

Finding Atlantic's first argument meritorious, for reasons we explain below, we reverse and remand for a new trial.

I.

We set forth the facts in the light most favorable to the jury's verdict. See Moysis v. DTG Datanet, 278 F.3d 819, 822 (8th Cir. 2002). Housing 21 is a limited liability company that was formed by Robert Bjerke, a lawyer with a background in real estate development, for the purpose of building an affordable housing development of 120 modular houses, called Riverview Estates, in Sioux City, Iowa. Bjerke understood that he needed to provide modular houses of high quality both to

ensure success in the market and to allay community fears that the development would be a "trailer park."

To finance the project, Bjerke contributed $150,000 of his own money, and Housing 21 received a $400,000 equity investment from eleven investors, including five charities: the Boys Club of Sioux City, Girls Incorporated of Sioux City, the Ronald McDonald House of Charities, the Boys and Girls Home of Sioux City, and the Council on Sexual Assault and Domestic Violence. Housing 21 also received a loan from Norwest Bank. Bjerke hired an experienced construction coordinator, oversaw site work, and advertised the project through direct mailings and in the local media.

Bjerke was familiar with Atlantic's houses, having used them in a previous project. In December 1995, he visited Atlantic's Central City, Nebraska, manufacturing plant and spoke with a salesperson about purchasing houses for Riverview Estates. Atlantic warranted that its houses would comply with the Uniform Building Code (UBC) and that they would be of high quality and ready for immediate occupancy. Atlantic stressed the similarity between its manufactured and modular houses and houses built on site. As a result, Bjerke decided to use Atlantic's houses for the project.

In June 1996, Atlantic and Housing 21 entered into a manufacturer-dealer relationship for the sale of modular houses. Atlantic was aware of the planned scale of the Riverview Estates project. On July 1, Housing 21 placed an initial order for the purchase of three houses from Atlantic. Atlantic constructed the houses and had them delivered in mid-July.

Problems with the houses were apparent immediately. On July 22 and July 25, 1996, Housing 21 sent letters to Atlantic complaining about the quality of the houses it had received. Substantial repair work had to be done to prepare the houses for an

August 1 showing for local dignitaries. At the showing, a representative from Atlantic assured Housing 21 that future houses would be of superior quality. On August 3, Housing 21 opened the houses for public viewing. Although it could show the houses, it was unable to sell them because of difficulties obtaining occupancy permits from Sioux City.

Housing 21 ordered a second group of three houses in mid-July 1996, and Atlantic had them delivered in late August. Again, Housing 21 was dissatisfied with the quality of the houses. On August 23, it sent a letter to Atlantic complaining about the poor quality of the houses and listing needed repairs. That fall, repair work on these houses was performed. A dispute arose between Housing 21, Atlantic, and city inspectors over whether the houses conformed to the UBC. Various Sioux City inspectors found the houses not to conform in numerous respects, and the city refused to issue certificates of occupancy. (Ultimately, it was determined that the city inspectors were not applying the UBC correctly, and that the houses failed to conform only in respect to the thickness of the sheet metal used in the duct work of the heating and cooling systems.)

On January 14, 17, and 20, 1997, Atlantic service technicians corrected the duct work, and Sioux City finally issued certificates of occupancy on January 23. However, problems with the houses persisted. Atlantic service technicians spent February 17 through 26 repairing the houses. Housing 21's own personnel had to spend substantial time doing repairs. Finally, some seven months after the first houses were delivered, sales were not able to support debt service, and the project failed.

On May 5, 1998, Housing 21 brought suit against Atlantic in an Iowa state court, claiming that the poor quality of the houses and their nonconformance with the UBC caused lengthy delays, an ongoing need for repairs, Housing 21's plummeting reputation, and a nearly empty development, and thus caused the failure of the entire

project. Atlantic removed the case to the United States District Court for the Northern District of Iowa. The case was tried from October 10 to October 23, 2000. At trial, Housing 21 presented evidence of numerous problems with the houses, including plumbing leaks, wavy joists, bowed window sills, wavy vinyl siding, walls that were not level or connected, toilets not bolted to the floor, disconnected cabinet doors, improperly installed cabinet tops, improperly installed entertainment centers, warped flooring, miscut linoleum, loose, mismatched, and missing molding and trim, mislaid carpet, and improperly cut doors.

On October 23, 2000, the jury returned a verdict in favor of Housing 21, awarding it $435,411.79 in damages. This appeal followed.

## II.

A. The Jury's Question Regarding the Identity of Housing 21's Investors

Atlantic argues that the District Court erred in its response to a question received from the jury during deliberations and that, consequently, Atlantic's motion for a new trial should have been granted. Housing 21 responds both that Atlantic failed to object adequately to the District Court's answer to the jury's question, thereby failing to preserve the error, and that the District Court did not commit any error in its response.

The jury commenced deliberations on October 23. That afternoon, the jury sent a note to the Court asking, in relevant portion, the following questions: "All under final instruction number 25. One, if any damages are awarded, who will get the money? Two, who makes up Housing 21? Names, please." Appellant's Appendix (App.) 1956. Jury instruction number 25 was the Court's instruction on items the jury should consider if it found that Housing 21 was entitled to recover damages. App. 309. After receiving the note, the Court afforded the parties the opportunity to

suggest appropriate responses. Atlantic and Housing 21 agreed that the proper response to the first question was that "Plaintiff Housing 21, LLC" would receive the money if damages were awarded. Id. at 1957-59. The Court agreed to this response. Id. at 1959.

There was disagreement, however, over how to handle the second question, which sought the names of the persons or entities that made up Housing 21. Housing 21 expressed reluctance to specify the names, but the Court indicated that a response would be proper. App. 1957-58. Atlantic then stated as follows:

> Well, the second [question]'s a little more problematical, Your Honor, in that I think it probably would simply involve telling them - - first of all, I don't think it's important. Housing 21 is a legal entity. It is the real party in interest. It is the plaintiff. I think in this context it's simply irrelevant.
>
> Second of all, I think it would be a matter - - to the extent they think this is of interest to them, it would simply be a matter of telling them to review the evidence. I think it would be improper at this point to send them a specific list.

Id. at 1959-60 (emphasis added).

> And I think it's that kind of a situation where, Your Honor - - you know, I don't know if the jury's back there saying, We don't want to give very much money, but if we give it, we want to make sure it goes to [Bjerke's wife][1] and not [Bjerke]. And I think telling them who the investors are could lead them down a wrong path and would overemphasize a certain part of the evidentiary record.

Id. at 1960 (emphasis added).

_____

[1]Mrs. Bjerke was among the investors.

Housing 21 agreed with Atlantic's suggestion that the Court simply instruct the jury to review the evidence and its notes of the trial. Id. at 1960-61. The Court, however, indicated that providing an exhibit in evidence would be preferable, and it suggested exhibit 87, a memorandum from Housing 21 to various investors, including the five charities, that discussed problems that Housing 21 had encountered with the project. Id. at 1966-67. Nevertheless, the Court expressed some reservation:

> I'm a little leery myself about the Boys and Girls Home and so forth . . . . [I]f it were known that the Boys and Girls Home, the Girls Home and the Boys Home and all of these names here were going to get some money, it might be a bigger incentive to give some money. And I really don't know if they're going to get any money, so I kind of hate to tell them that they might.

Id. at 1968.

Atlantic agreed with the Court's concern and noted, correctly, that exhibit 87 did not contain a complete list of the investors. As an alternative, it suggested that the Court use a document that had been marked as exhibit 424, an operating agreement for Housing 21 that was not in evidence but that did contain an accurate list of all of the investors as well as their ownership interests. Each of the five charities had a two per centum interest. App. 1977-78. The Court accepted this suggestion. After the Court reiterated what it intended to do, Atlantic responded: "If the Court is going to answer it that way and tell them who it is, I think that's the way to do it and tell them the exact owners and percentages rather than - - because it is confusing to look at Exhibit 87." Id. at 1979. Later, Atlantic again indicated that it would accept the Court's response to question two, "subject to the record I made earlier." Id. at 1981.

The colloquy between the Court and both parties concluded at 4:02 p.m., id. at 1983, after which the Court gave its answer to the jury. Shortly thereafter, the jury returned with its verdict. The entire proceeding concluded at 5 p.m. Id. at 1988.

Housing 21 contends that Atlantic's objection to the District Court's response was insufficient to preserve the claim of error. It argues that Atlantic preserved only its objection to the Court's response to the two other questions, not to question two. It also argues that Atlantic stated only that the jury's question, not the Court's response, was irrelevant, and, citing Tinnon v. Burlington N. R.R., 898 F.2d 1340, 1343 (8th Cir. 1990), that a relevance objection to a jury instruction is insufficiently specific as a matter of law. Housing 21 also argues that Atlantic never objected specifically on the grounds that providing a list of investors would overemphasize certain evidence.

These contentions are without merit. Federal Rule of Civil Procedure 51 does not require a party to employ the utmost formality in making an objection to avoid waiver. Meitz v. Garrison, 413 F.2d 895, 899 (8th Cir. 1969) ("The rule does not require formality, and it is not important in what form an objection is made or even that a formal objection is made at all, as long as it is clear the trial judge understood the party's position . . . .") (citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 51.04 (2d ed. 1968)); 9A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2554, at 428 (2d ed. 1995) ("No particular formality is required of the objection so long as it is clear that the trial judge was informed of possible errors in the charge and was given an opportunity to correct them."). All that is required is that the objector "stat[e] distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51. The previous discussion makes clear that Atlantic did object to providing an answer to question two—both when it first received the jury's question and when the Court proposed an answer—on the grounds that a response to that question would be irrelevant and potentially prejudicial. It is also clear that the District Court understood these concerns.

Moreover, Housing 21's citation to <u>Tinnon</u> is inapt. <u>Tinnon</u> simply holds that a party's objection to a jury instruction on the grounds that it was misleading and not applicable to the facts does not preserve for appeal an objection on the ground that a portion of the applicable statute had been omitted from the instruction. 898 F.2d at 1343. Nowhere does <u>Tinnon</u> state that a relevance objection to a jury instruction is legally insufficient.

Turning to the merits of the objection, Atlantic argues that the identities of the investors in Housing 21 are irrelevant to the issues in the case. Atlantic is correct. Housing 21, the sole plaintiff, is a distinct legal entity. None of the investors was party to the suit, and their identities had no bearing on any issue under the jury's consideration. It was improper for the jury to consider or to place any weight on the identities of the investors in determining whether Housing 21 was entitled to a damage award.

Housing 21 does not contend that the investors' names actually were relevant, just that the names of various of the investors had been introduced during trial without objection from Atlantic, and that the exhibit proposed by the Court, exhibit 87, which contained almost all of the names (including the charities), already was in evidence. Housing 21 argues that it is inconsistent for Atlantic to raise a relevance objection to information supplied in answer to a jury's question when it did not raise such an objection when the same information was offered in evidence initially.

There is no inconsistency. Evidence of the investors' names had come in only incidentally, not because anyone contended their identities mattered to the outcome of the case. Not every piece of information presented over the course of a trial will necessarily be relevant to the issues that the jury must decide. And there are practical reasons not to raise every conceivable objection. Moreover, a party does not waive the right to object to initial or supplemental jury instructions on the grounds that the instructions provide or unduly emphasize (through judicial imprimatur) irrelevant

information, simply because that party did not object when some of the information was first presented.

Housing 21 also argues that the Court's response did not instruct the jury on a matter of law but simply answered a factual question in a way that was neither misleading, incorrect, unclear, nor unresponsive. This argument misses the point. The answer was misleading. It directed the jury to factual information that was not relevant to the jury's determination of whether Housing 21 should receive a damages award or, if so, the size of any such award. The jury apparently believed that an answer to the question was essential to its verdict, and, by providing irrelevant information, the Court failed to disabuse the jury of this mistaken belief. An analogous case is Dakota Industries, Inc. v. Ever Best Limited, 28 F.3d 910 (8th Cir. 1994), in which we reversed a judgment and ordered a new trial on the ground that the District Court, in answering a question from the jury, had injected a new, and irrelevant, issue into the case.

Housing 21 also argues that, apart from any objection to the names of investors, Atlantic can have no objection to the Court's providing their respective ownership interests (which were not in evidence), which Atlantic requested be included in the response to the jury. It is true that if Atlantic had no well-founded objection to the provision of the names, it could not create reversible error by insisting that the Court include other irrelevant information (or information not in evidence) such as the ownership interests, and then appeal its inclusion in the Court's response. However, Atlantic did object to providing the names of the investors, and the Court overruled the objection. Atlantic's attempt to mitigate the potential prejudice to it of the Court's decision to provide the names to the jury by asking that the Court also provide the ownership interests does not erase its objection.

Moreover, the likelihood of prejudice due to the Court's error is high. Citing United States v. Glick, 463 F.2d 491, 494 (2d Cir. 1972), Atlantic contends that the

fact that the jury returned with a verdict so shortly after receiving the District Court's response to its inquiry indicates a substantial likelihood that the answer allowed the jury to reach a compromise verdict. Atlantic infers that one or more jurors doubted that damages should be awarded to Housing 21 but nonetheless agreed, after receiving the Court's supplemental instruction, to award damages under the belief that some of the money ultimately would go to charitable organizations. Housing 21 argues that Glick and other criminal cases cited by Atlantic are inapplicable because in those cases the trial court was reversed because it misstated the law or followed improper procedure. But Atlantic cites those cases not to reveal the Court's error but to demonstrate the likelihood of prejudice. Here, the fact that the jury rendered its verdict almost immediately after receiving irrelevant and potentially prejudicial information makes it reasonably likely that the jury mistakenly relied on that irrelevant information in forming the verdict. Cf. Rogers v. United States, 422 U.S. 35, 40 (1975) ("The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of guilty with extreme mercy within five minutes after being told unconditionally and unequivocally that it could recommend leniency strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.") (citations and internal quotation marks omitted).

### B. Sufficiency of the Evidence that Atlantic Caused Housing 21's Lost Investment Damages

The jury awarded Housing 21 $430,000 in damages for loss of investment. Atlantic contends that the evidence that defects in the six houses it provided caused the entire project to fail was legally insufficient and, therefore, that the District Court erred in failing to grant its motion for judgment as a matter of law on this issue. Our review of the denial of the motion is de novo. Gray v. Bicknell, 86 F.3d 1472, 1478 (8th Cir. 1996). We view the evidence in the light most favorable to the verdict,

considering every legitimate inference that reasonably can be made from the evidence.  American Family Mut. Ins. Co. v. De Groot, 543 N.W.2d 870, 871 (Iowa 1996).

Although the issue of causation typically arises in the context of tort cases, the legal principles involved apply equally to a breach of warranty case.  Winter v. Honeggers' & Co., 215 N.W.2d 316, 320 (Iowa 1974).  Under Iowa law, causation includes the two traditional components of causation in fact and legal causation.  Gerst v. Marshall, 549 N.W.2d 810, 815 (Iowa 1996).  Regarding factual causation, "the majority of our decisions require a plaintiff to meet both the but-for test of causation, with the concurrent cause exception, and the Restatement's substantial factor requirement."  Id. at 817.  Under the concurrent cause exception, but-for causation need not be established when "two causes concur to bring about the event, and either one of them, operating alone, would have been sufficient to cause the identical result."  Id. at 815 (quoting Prosser and Keeton on the Law of Torts § 41, at 266 (5th ed. 1984)).  In such a situation, the plaintiff establishes causation by showing that the defendant's conduct was a material element and a substantial factor in bringing about the event.  Id.

Atlantic argues only the absence of but-for causation.  In doing so, it contends that the record demonstrates that the 120-house project failed not because of defects in the six houses that it provided but because of "Housing 21's inadequate financing, its unsuitable marketing, the general incompetence of [its] staff, persistent bad weather, and the bizarre and unlawful conduct of Sioux City officials."  Appellant's Brief 41-42. This argument suggests that alternative (or concurrent) causes other than Atlantic's breach caused the lost-investment damages.  Atlantic further contends that Housing 21 could have—indeed should have—taken various corrective measures to prevent and limit any damages resulting from defects in the houses (e.g., hiring contractors to fix the problems more quickly, rescheduling the planned open house, turning to a different manufacturer).  Appellant's Reply Brief 15.  This argument

-12-

goes, in essence, to Housing 21's obligation to mitigate damages, not to the question of factual causation.

Housing 21 responds, correctly, that sufficient evidence exists for a jury to have found that Atlantic's breach of warranty was a material and substantial factor in causing its investment damages. Viewing the evidence in the light most favorable to the jury's verdict, Housing 21 and Atlantic agreed that Atlantic would provide well-constructed modular houses complying with the UBC. Atlantic broke its warranty by providing houses in poor condition that did not meet all of the UBC's requirements. Housing 21 had to wait for more than six months to receive occupancy permits for the houses, and at least part of the reason for the delay was the poor condition of the houses and their incomplete compliance with the UBC. The poor condition of the houses hurt not only sales of the six houses but the reputation, and thus the viability, of the entire project. The delay in sales and the injury to reputation caused revenue to be lower than expected and insufficient to support debt service, ultimately causing the project to fail.

A reasonable jury could well have rendered a verdict in Atlantic's favor, finding that the various factors described by Atlantic alone caused the project to fail. But this jury did not do so, and its determination was not unreasonable. As the Supreme Court stated in <u>Lavender v. Kurn</u>, 327 U.S. 645 (1946):

> Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where . . . there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that

the court might draw a contrary inference or feel that another conclusion is more reasonable.

Id. at 653.

C.  Jury Instruction Numbers 25, 26, and 27 and Lost Future Profits

As part of its instructions to the jury on the issue of damages, the Court gave instructions 25 (listing types of damages),[2] 26 (lost investment),[3] and 27 (lost future

---

[2]Instruction number 25 reads as follows:

   If you find Housing 21, LLC is entitled to recover damages, you shall consider the following items:

   1.  Cost to correct defects;
   2.  Loss of investment;
   3.  Lost future profits; and,
   4.  Other incidental damages.

   A party cannot recover duplicate damages.  Do not allow amounts awarded under one item of damage to be included in any amount awarded under another item of damage.

Appellee's App. 309.

[3]Instruction number 26 reads as follows:

   In considering any loss resulting from general or particular requirements and needs of which the seller at the time of the contracting had reason to know in determining what damage, if any, were sustained by Plaintiff, you are instructed that if because of Defendant's breach of express warranty, Plaintiff lost equity in the development or lost investment due to unrealized sales, then Plaintiff was in fact damaged.

Appellee's App. 310.

-14-

profits).[4] Atlantic argues that the District Court erred in submitting these instructions to the jury because, it asserts, an instruction for lost future profits was contrary to the law and the evidence of the case.

Atlantic asserts that Housing 21 did not establish that Atlantic's breach caused Housing 21 to lose any future profits. Atlantic also argues, citing several Iowa cases, that the Court should not have given the damage instruction on lost future profits because consequential damages can be awarded under Iowa Code section 554.2714 only if such damages are foreseeable to the seller at the time of contracting. Lost future profits, it argues, were not foreseeable. Atlantic further argues that Iowa's new-business rule prevents a new enterprise from recovering lost future profits because the amount of any such award would be too speculative. However, the jury

---

[4]Instruction number 27 reads as follows:

In considering the element of future profits in determining what damages, if any, were sustained by Plaintiff, you are instructed that if because of Defendant's breach of warranty, the Plaintiff was unable to earn net profits which would have accrued to it but for a breach of the warranty, then Plaintiff was in fact damaged. Future profits mean net profits and are determined by subtracting the costs and expenses of a business from its gross revenue.

The fact that a Plaintiff's business may have been new or unestablished is not fatal to the element of damages constituting net profits. You are instructed that you may consider the following factors in determining whether or not any part of Plaintiff's damages constitute future net profits, including but not limited to, the uncertainty which makes the success of a new business problematical, the experience of the Plaintiff's officers in the business, the competition which the Plaintiff would have had in Sioux City and the surrounding area and the general market conditions in said area.

Appellee's App. 311.

did not award Housing 21 any damages for lost profits, so even if there was error (which we need not decide), it was harmless.  Crittenden v. Tri-State Thermo King, Inc., 108 F.3d 165, 167 (8th Cir. 1997) ("Since the jury found for Tri-State on this theory, any error in the instruction would clearly be harmless."); Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d 682, 685 (Iowa 1990) ("[E]rror in giving or refusing to give a particular instruction does not warrant reversal unless the error is prejudicial.").

Atlantic also contends that because Housing 21 retained possession of the houses and sought damages for lost future profits it had no right under Iowa law to seek damages for loss of investment.  This argument has no basis.  Housing 21 agrees that it would not be entitled to an award of both loss of investment and loss of future profits.  However, as we have noted, Housing 21 did not receive a damage award for loss of future profits.  Loss of investment can properly be awarded as an element of consequential damages, and a party can argue both theories of expectancy and reliance damages.  Mid-Country Meats, Inc. v. Woodruff-Evans Const., 334 N.W.2d 332, 337 (Iowa App. 1983).

Finally, Atlantic raises several arguments regarding the amount of damages that the jury awarded for lost investment.  For example, it argues that the instructions should have required the proceeds received by Housing 21 from the sale of the houses to be credited against any loss of investment damage.  Because the case is being remanded for a new trial, we need not address these arguments.

For its part, Housing 21 argues that the jury should have awarded lost profits, and that the Court erred by not ordering such damages or a new trial on the issue.  This argument is spurious.  Housing 21 presented no expert on future profits, and the evidence that it did present was highly speculative.  There is no basis for concluding that the jury's determination on damages for loss of future profits was unreasonable.

## D. Atlantic's Summation

During summation, as part of an argument that businesses frequently fail for any of a number of reasons, Atlantic referred to the recent failure of a local restaurant called the Blue Stem. In a cross-appeal, Housing 21 argues that Atlantic's summation was improper because there was no evidence in the record regarding the Blue Stem, and that Atlantic's reference caused the jury to fail to award lost future profits. Citing no evidence, Housing 21 hyperbolizes, "[i]t is certain that the verdict was influenced by the misconduct of Atlantic." Appellee's Brief 62.

This claim requires no extended discussion. Housing 21 itself points out that our review is for abuse of discretion and that, to constitute reversible error, statements made in a closing argument must be plainly unwarranted and clearly injurious. Griffin v. Hilke, 804 F.2d 1052, 1057 (8th Cir. 1986), cert. denied, 482 U.S. 914 (1987). Moreover, the complaining party bears the burden of making a concrete showing of prejudice. City of Malden v. Union Elec. Co., 887 F.2d 157, 164 (8th Cir. 1989). Housing 21 does not approach this threshold. The District Court did not abuse its discretion.

## III. Conclusion

For the foregoing reasons, we reverse the judgment of the District Court and remand the case for retrial. On remand, the issue of lost future profits will not be open. The jury has specifically determined to award nothing on this score. No error that has either been urged or found affects this conclusion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.